IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL ACTION NO. |
| ) | 2:10-cr-15-WKW |
| RONALD DEMARKUS THOMAS ) | |

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Pending before the Court is *Defendant's Motion to Suppress Statements* (Doc. 87, filed August 5, 2010). The United States' filed its *Response to Defendant's Motion to Suppress* (Doc. 102, filed September 17, 2010). After the December 22, 2010 evidentiary hearing and due consideration of briefs, arguments, and applicable law, the Magistrate Judge concludes that the incriminating statements made by the defendant are admissible and recommends that the District Court **DENY** the motion to suppress.

I. FACTUAL BACKGROUND AND MOTION TO SUPPRESS

Neither party disputes the operative facts largely because the statements at issue were recorded by the police. On October 26, 2009, the Troy Police Department began to investigate a complaint that three men in Troy, Alabama broke into a trailer wherein they sexually assaulted two women and physically assaulted others within the trailer. During the investigation, Troy Police began to suspect Ronald Demarkus Thomas ("Thomas") and others were the assailants. Around 8:20 p.m. Detective Terry Miles and Detective Mike Hughes began to interview Thomas at the Troy police station. Prior to the interview, the

Detectives read a rights warning form to Thomas which lists several rights afforded to every suspect. The Court admitted a copy of the form as Government Exhibit 3. Detective Hughes put check marks next to each right when Thomas said he understood the particular right. The transcript of the interview with respect to the rights warnings states:

> Thomas: I still ain't figured out what I'm fixing to jail for...[.]
>
> Miles: We, we going to explain all that to you.
>
> Hughes: First I need to read you your Miranda Rights okay. Before we ask you any questions you must understand your rights. Do you understand that?
>
> Thomas: (no response)
>
> Hughes: Is that yes or no please?
>
> Thomas: Yes sir.
>
> Hughes: Okay, you have the right to remain silent. Do you understand that?
>
> Thomas: Yes sir.
>
> Hughes: Anything you say can be used against you in court. Do you understand that?
>
> Thomas: Yes sir.
>
> Hughes: You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during

questioning. Do you understand that?

Thomas: Yes sir.

Hughes: If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. Do you understand that?

Thomas: Yes sir.

Hughes: If you decide to answer questions without a lawyer present you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. Do you understand that?

Thomas: Yes sir.

Hughes: Okay, what I'd like for you to do now is read this paragraph out loud and if you, if it's true I'll get you to sign on that line okay.

Thomas: I have read and or have been read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or...

Hughes: Coercion.

Thomas: [...]coercion of any kind had been used against me.

Hughes: Is that true?

Thomas: Yes sir.

> Hughes: Now if you would like to talk to me now, I'll get you to sign on that line okay.

* * *

After the rights warnings, Thomas gave an incriminating statement and later gave two other incriminating statements. Thomas chose not to present any evidence or testify during the suppression hearing.

Per Troy Police Department policy, Hughes had Thomas read aloud the final paragraph and sign the form to indicate his consent to answer questions. The rights advisement and all of the interview thereafter was recorded by the detectives onto a compact disc. The Court admitted the compact disc as Government Exhibit 1 and a rough transcript of the compact disc as Government Exhibit 2. The salient point of the interview upon which Thomas bases his motion to suppress is a conversation about whether Thomas chose to invoke his right to counsel. The transcript states:

> Thomas: I don't, I don't know nothing about no victim, I'm (unintelligible) I'm... ya'll, ya'll, ya'll don't have to believe me.
>
> Miles: Well we don't.
>
> Thomas: You don't have to believe me.
>
> Miles: I mean we don't.
>
> Hughes: We don't.

Thomas:  Get me lawyer now, cause I ain't...

Miles:  That's what you want?

Thomas:  I ain't...

Miles:  You want your lawyer?

Thomas:  I ain't be put in jail for something I ain't do sir, I keep telling ya'll I was not around no victim, no lady last night. The only ladies I was around last night is Melissa, that's my cousin. And my auntie, them the only ladies I was around me last night.

Miles:  Well, well Melissa said she didn't take you to nobody's house last night. So, you lying again.

Thomas:  Man I stayed, I, I drunk two (unintelligible) Paul's Son, drunk three beers.

Miles:  Um hum, well he saying he going to get him a lawyer, you want a lawyer? Is that what you want or you want to talk, what you want to do?

Thomas:  Listen, we, we, we, we going to talk but, what, what, what, what...

Hughes:  Okay, that's fine.

Thomas: What, what, what, okay, that, what I'm saying is, okay I'm going to start from here, I, I, I drank [two] shots of Paul and Son and I had, I had I drunk me three beers.[1]

## II. Discussion and Analysis

The parties concede and the Court agrees the pivotal issue is whether Thomas made a clear and unequivocal request for counsel. *Mincey v. Head*, 206 F. 3d 1106, 1131-32 (11th Cir. 2000). Questioning must cease when a suspect clearly requests counsel. The Court finds that Thomas did not clearly or unequivocally request counsel.

Human experience is rife with examples that printed words do not fully convey a message or the intended message, even though the printed words may be a near verbatim recitation of what was said. One reason printed words may have a gap between what was said and what the speaker intends to convey is that the print medium, even with correct punctuation, may be unable to convey nuance, context, tone or inflection. For instance, a person could snarl and say, "I love you!" yet convey just the opposite meaning of love, whereas a person could whisper or in conversational tone say, "I love you!" and convey the opposite message. While the written words "I love you!" carry correct grammatical punctuation and are identical, the listener will rightly draw a different message than the reader. The portion of the rough transcript below is a shining example of the difference between that which is said and the true meaning of that which one speaks.

        Thomas:    Get me lawyer now, cause I ain't...

As written, the rough transcript indicates Thomas made a request for counsel. Without more than the written words, the United States would be hard pressed to argue Thomas did not invoke his right to counsel. Unfortunately for Thomas, the United States had more, an audio recording. The audio recording coupled with the testimony from Detective Miles indicates the request for counsel was equivocal, but that upon clarification, Thomas did not signal an intent to

cease the interview. Detective Miles testified that he understood Thomas to say that he was going to get an attorney in the future and that he was not exercising his right to counsel at the moment. The Court credits Detective Miles that he did not believe Thomas was exercising his right to remain silent until he had a chance to confer with counsel. Detective Miles has 9 years of law enforcement experience and the Court is satisfied that had Thomas made an unequivocal request for counsel, Detective Miles would have stopped the interview. The portion of the interview regarding counsel was very short, but when Detective Miles heard Thomas make statements bordering on a request for counsel he asked clarifying questions to ensure Thomas intended to make a statement. When asked a clarifying question, Thomas said he would talk.

After an independent review of the audio recording, the Court concludes the request is ambiguous and Thomas **clearly indicated his intent to secure counsel in the future rather than demand counsel at the moment**. The printed transcript also confirms that Thomas did not intend to terminate his statement to the detectives. Detective Miles acted appropriately inasmuch as he made sure, through clarifying questions, that Thomas did not intend to cease talking until his lawyer was present. Thomas clearly said he would talk and proceeded to give a statement. Nothing before the Court indicates any force or improper inducements were given to Thomas to make a statement. Therefore the statements are admissible.

Pursuant to the foregoing findings and conclusions, it is the recommendation of the Magistrate Judge that *Defendant's Motion to Suppress* Statements(Doc. 87) be **DENIED**.

It is further **ORDERED** that the parties shall file any objections to the said Recommendation not later than **January 12, 2011.** Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.

Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981)(*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

DONE this 29th day of December, 2010.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE